Yeah, honestly, my recollection about what he said about how the photo array was put together was that he had a photo of Mr. Whitewater, that he took that to the person on the FBI staff and asked for an array of individuals with similar physical features, and that's what he got back. And so the process of Mr. McWilliams suggesting that there ought to be other individuals who live in the community, that's simply not the way they go about doing their business with the FBI. Well, was that his answer, that that's just not the way we do it? No, Your Honor. No, no, I'm sincere. When he was asked about Antonio Baker and Cody Chilson, I believe it's said, what did the FBI agent really say? That's just not the way we do photo arrays? Yeah, that's my characterization. My recollection of what he said was that he simply recited the process by which he went about getting rid of someone. It's not the way they do business, right? Those are my words, Your Honor, but I think it's a fair characterization. Okay, thank you. So what I want to say about this whole identification thing is Mr. McWilliams gave a decent characterization of the facts that led to this matter, but I want to give you some additional facts. First of all, Your Honor, Mr. Wolfe and Mr. Miller were at this party at Lindsey Brown's place, and her place was a trailer. It was a trailer home. And the best evidence that we had about the number of people who were at this party was seven. That's the highest number, and that would have included both other victims, Mr. Wolfe and Mr. Miller, as well as Mr. White. So there's seven individuals in a trailer that's sitting around drinking beer for a period of time. And the thing that is unique and distinctive about Mr. Whitewater is that he has this floppy, this dark floppy fishing cap on. That's what I refer to it as, is a fishing cap. It's a flop hat, and it has marijuana leaves on it. And he's wearing this hat, and eventually he ends up in a situation with another person at the party, Mr. Taylor Morris. Mr. Morris apparently bloodies his nose because of something that Mr. Whitewater either said to Mr. Morris' girlfriend or to his sister. The record is kind of not completely clear on that. But when that incident happened, the person whose trailer they were in asked Mr. Whitewater, she says, you got to go. And so Mr. Wolfe and Mr. Miller are there sitting around drinking beer. They don't know the name of Mr. Whitewater, but he's there in a small, confined space wearing this flop hat with the marijuana leaves on it with the slanty eyes. And then they have an additional reason to pay special attention to him because he gets kicked out of the party. So you said that they didn't know his name. So this is the first time. Does the record show that Miller and Wolfe never had seen or met Mr. Whitewater before this party at the trailer? Young, I think the extent to which that question was pursued was, did you know Mr. Whitewater before this party? The answer was the answer by both individuals that they did not know him as to whether or not they had seen him, but not introduced. That question was not pursued by Mr. McWilliams or by myself. So they see that we put out the party. Mr. Miller basically says, well, you know, we better get out of here. So eventually Mr. Wolfe comes out. They leave Lindsey Brown's residence. They go north up to the to the Pony Express and they get some cigarettes. And the jury that this whole thing about Mr. Miller having been drunk and whatever it is, he tested that Mr. Mr. McWilliams used that argument during the course of the actual trial. And the jurors were able to see the video, the surveillance video from that particular store. When Mr. Miller gets out of the blacktop home, you know, you know, walks very regularly without any evidence of being drunk and then and then pulls off. So they were able to take the argument that he was drunk in consideration of what they were seeing about how he was carrying himself, carrying himself. But in any event, they leave and head back south. And when they get to this roundabout, they they encounter this vehicle, this this blue Pacifica. And Mr. Mr. Miller, his testimony was that when he gets to this to this area, he can see this vehicle pulling up behind him. And he thinks that his police, he says cops, he tells Mr. Will to put to put a seatbelt on and Mr. Mr. Miller slows down to about 30 miles an hour. And the evidence in the record is that he had his window down and he's smoking a cigarette and he's waiting to see what these cops are going to do. So he sees the cops closing in on him. He sees the cops closing in on him. He's trying to do everything as correctly as he can. And next thing you know, the Pacifica pulls up to him and out of the past, the Pacifica pulls up to the left side of Mr. Miller. There are two lane highway, one vehicle in each direction. And Mr. Miller says that this this Pacifica pulls up next to him. And Mr. Whiteboard has wondered out hanging out the window. He doesn't have a window down.  He's hanging out the window. He's got a firearm in the air right next to his vehicle. And basically, you know, I'm not going to say for these folks in here, but you know what? What Mr. Whitewater said to Mr. Miller and to Mr. What's up now? And then he fires off a couple rounds. It's during this period that Mr. Miller has plenty of reason to be focused on the individual that's pulling up next to him. One, because he thinks it's a cop. And then secondly, because the guy is hanging outside the window with a gun in his hand. And so it's at that point that Mr. Miller speeds up. It's like, oh, my God, he pulls off the record sports and they're driving 90 miles an hour down Highway 77. Mr. Miller was. I was thinking about the lineup and you've described a very what you've described as a clear sighting on the part of Miller to visual. So when the officers asked to identify the person, who did they ask to identify the person who was in the car? Or did they say who was the person at the party? Yeah, the lineup was put together by a FBI agent friend and he went to visit with Mr. So this incident happened about three o'clock in the morning on May 2nd, 2016. He went to visit with Mr. Wolf two days later on May 4th. He interviewed him first. And when he when he interviewed him, he was asking him to identify who he thought she was. And Mr. Wolf, Mr. Wolf testified that his statement to the FBI agent was based upon not having actually seen the shooter. He said he did see the shooter, but not his face, because he said that he saw the gun. You know, you know, he's sitting in the passenger side. He looks over and he can see that there's a guy hanging out with the gun, but he doesn't. He's not able to positively identify Mr. Wolf because of his positioning inside the Tahoe. He's able to tell the agent who the shooter was based upon his identification of Mr. of him being the person we had seen got put out of the party. The reason why he's able to do that is that because when Mr. Miller speeds away from his vehicle with the shooter in it, he tells Mr. Wolf, call the cops. And when he calls the cops, Mr. Wolf testified, told the jury that Mr. Miller told me is the dude in the flop hat from the party that's doing the shooting. So, yes, Mr. Wolf, when he's testifying, he's testifying based upon Mr. Miller having told him as they're trying to get away from him, that was Mr. Whitewater, the guy with the flop hat from the party that was doing the shooting. But it was six weeks before they do the photo line after that. Yes. June 17. Yes. That is correct. And when when Miller was shown the the lineup did was Miller asked who was the shooter or who was the person at the party? Mr. Miller was was asked to identify the shooter because he testified that it was a person with the flop hat with the slaying of the guy at the party. So that's that's what happened with Mr. Miller. He was able to identify he was right next to him. Yeah. Yeah. Irrespective of whether or not this lineup, if you somehow have a problem with it, if you think just the camp was in the air and admitting it, the evidence against Mr. Whitewater was so overwhelming. It is not at all dependent upon this lineup. But he went when they when the officer pulled the car over, it was Mr. Mr. Codefendant, Mr. Help me with this. Blackhawk. And and and Mr. Whitewater is disappeared. So. So how how can if a jury hears that? We're not there. I mean, thank you for that question. So we never did get to the end of the story. So they get they get in a walk to you and the cop who's seen them rolling down the road at this high speed is engaged in pursuit. He loses contact with Mr. Blackhawk makes a turn in Wall Hill. Obviously, that's when Mr. Whitewater gets out of the vehicle. We know that it was Mr. Whitewater because Mr. Blackhawk's girlfriend said that Mr. Whitewater had come to their residence three, three thirty in the morning saying, you need to come with me so we can go deal with these guys and just see. And then the last thing I see them down to three, two or three seconds. Mr. Whitewater was living with the sister of the girl who had the party. And her father testified that it was this 22 caliber Ruger that had been stolen while Mr. Whitewater would live in their residence from time to time. Young young as the evidence was overwhelming. And I would ask you to find that this case should be a farm. Thank you. Thank you for the argument. Mr. Butler. Any kind of government tells you that the evidence was so overwhelming that suppressed evidence was unnecessary. Should that be a question? Well, then why was it introduced? Why was it? Why did their testimony on three separate times? Why did the FBI do it? The bottom line is that it was very necessary to their case. The evidence was not overwhelming. The witnesses were all over the board in terms of the times that certain events happened. Who was here? Who was there? There is always the the lingering specter of Antonio Baker and Cody Chilson. There is simply I think identity was the only issue at a trial. As Judge Kelly, Mr. Whitewater was never found on the scene. Mr. Whitewater made no statements admitting guilt. He flatly denied involvement in this from the get go. But there is but there is one eyewitness who identifies. Right. There is an eyewitness to the case. Yes, Your Honor. And the trial would have gone to mark the difference if the one eyewitness had taken the witness and said I was driving down the road. A car pulled up and the guy from the party fired a couple shots at me. And that was the end of it. The cross-examination would have been radically more effective. My my questioning about his level of intoxication. The lighting, the effect of the radio, his memory, etc. would have been would have been far, far more effective. Instead, though, what we had was that plus three separate witnesses saying six weeks ago in the cold light of day, we were shown a photo of six different individuals. And this guy was picked out definitively as the shooter, which is which are males in the coffin. As Justice Brennan pointed out, there is nothing more devastating than a criminal trial and have someone come in and say that's him. And the light of it was not simply something not distinguished. It didn't need to be added. It created a very substantial risk of misidentification. It not only affected, it not only supplemented Mr. Miller's court testimony, it affected it, which is why the remedy for for improper admission of a photo is not simply to do it over, but to suppress the court identification. The two part test is met very, very decisively by Mr. Water. It was implicitly suggested. We know that because somebody didn't see the shooter, identify the shooter, and it wasn't reliable. Given all the various factors, the narrow amount of time, the level of intoxication, all of those will take from Mr. Whitewater. This report engaged in none of this analysis. I ask the court to reverse Mr. Whitewater's conviction on many cases. Thank you very much. Thank you for your argument, too. Both cases, 17-1258 and 17-1259 are submitted for decision. Thank you. Thank you.